## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### BECKLEY DIVISION

| | | |
|---|---|---|
| LORRAINE KING, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 5:09-01515 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## M E M O R A N D U M   O P I N I O N

This is an action seeking review of the decision of the Commissioner of Social Security

denying Plaintiff's application for Disability Insurance Benefits (DIB) and Supplemental Security

Income (SSI), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 40 - 433, 1381-

1383f. This case is presently pending before the Court on Plaintiff's Motion for Summary Judgment

(Document No. 13.) and Defendant's Motion for Judgment on the Pleadings. (Document No. 17.)

Both parties have consented in writing to a decision by the United States Magistrate Judge.

(Document Nos. 7 and 8.).

The Plaintiff, Lorraine King (hereinafter referred to as "Claimant"), filed applications for

DIB and SSI on July 25, 2007 (protective filing date), alleging disability as of July 19, 2007, due

to "[f]ibromyalgia, arthritis, heart condition, thyroid no longer working, depression, stress, high

blood pressure, sinus tac[hyc]ardia, high cholesterol, asthma/breathing problems, dry eyes, memory

loss, [and] acid reflux." (Tr. at 9, 140-44, 145-49, 172.) The claims were denied initially and upon

reconsideration. (Tr. at 92-94, 95-97, 104-06, 107-09.) On June 7, 2008, Claimant requested a

hearing before an Administrative Law Judge (ALJ). (Tr. at 110-12.) The hearing was held on

February 12, 2009, before the Honorable Mark A. O'Hara. (Tr. at 35-91.) By decision dated April 28, 2009, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 9-34.) The ALJ's decision became the final decision of the Commissioner on October 23, 2009, when the Appeals Council denied Claimant's request for review. (Tr. at 1-5.) On December 16, 2009, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 2.)

Under 42 U.S.C. § 423(d)(5), a claimant for disability has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2008). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall

v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain

v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether

the claimant is able to perform other forms of substantial gainful activity, considering claimant's

remaining physical and mental capacities and claimant's age, education and prior work experience.

20 C.F.R. §§ 404.1520(f), 416.920(f) (2008). The Commissioner must show two things: (1) that the

claimant, considering claimant's age, education, work experience, skills and physical shortcomings,

has the capacity to perform an alternative job, and (2) that this specific job exists in the national

economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must

follow a special technique at every level in the administrative review process." 20 C.F.R.

§§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs

and laboratory findings to determine whether the claimant has a medically determinable mental

impairment and documents its findings if the claimant is determined to have such an impairment.

Second, the SSA rates and documents the degree of functional limitation resulting from the

impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those

sections provide as follows:

> (C) *Rating the degree of functional limitation.* (1)Assessment of functional
> limitations is a complex and highly individualized process that requires us to
> consider multiple issues and all relevant evidence to obtain a longitudinal picture of
> your overall degree of functional limitation. We will consider all relevant and
> available clinical signs and laboratory findings, the effects of your symptoms, and
> how your functioning may be affected by factors including, but not limited to,
> chronic mental disorders, structured settings, medication and other treatment.
> (2) We will rate the degree of your functional limitation based on the extent
> to which your impairment(s) interferes with your ability to function independently,
> appropriately, effectively, and on a sustained basis. Thus, we will consider such
> factors as the quality and level of your overall functional performance, any episodic
> limitations, the amount of supervision or assistance you require, and the settings in

which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[1] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the

---

[1] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation , each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since the alleged onset date, July 19, 2007. (Tr. at 12, Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from obesity, osteoarthritis, and fibromyalgia, which were severe impairments.[2] (Tr. at 12, Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 28, Finding No. 4.) The ALJ then found that Claimant

---

[2] The ALJ noted that Claimant had the diagnosis of fibromyalgia but did not have "the documentation of the medical signs and findings required to support the diagnosis[.]" (Tr. at 12.) Noting that the mere diagnosis of fibromyalgia did "not generally preclude the work within the parameters of the stated residual functional capacity[,]" the ALJ nevertheless "treated the [C]laimant as having fibromyalgia that [was] severe under the regulations." (Tr. at 13.)

5

had a residual functional capacity to perform work at the light and medium levels of exertion, as follows:

> [C]laimant has the residual functional capacity to perform light and medium work as defined in 20 CFR 404.1567(c) and 416.967(c) that involves only occasional crawling and climbing of ladders, ropes, and scaffolds and no more than frequent crouching, kneeling, stooping, balancing, and climbing of ramps and stairs and that avoids concentrated exposure to extreme heat, extreme cold, humidity, vibrations, fumes, odors, dusts, gases, poor ventilation, or workplace hazards (such as moving machine parts and unprotected heights).

(Tr. at 30, Finding No. 5.) At step four, the ALJ found that Claimant could return to her past relevant work as a cashier, retail manager, and pencil sharpener assembler. (Tr. at 31, Finding No. 6.) Additionally, on the basis of testimony of a Vocational Expert ("VE") taken at the administrative hearing, the ALJ found that Claimant could perform jobs as a laundry worker and packer/bagger at the medium exertional level and as an assembler and a laundry worker at the light exertional level. (Tr. at 32.) Additionally, the ALJ found that in the absence of the VE's testimony and Claimant's past relevant work, "the DDS 'Medical/Vocational Analysis' at Exhibit 18E would support a denial under the applicable medical vocational rules." (Tr. at 33.) On these bases, benefits were denied. (Tr. at 33, Finding No. 7.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was born on March 16, 1957, and was 51 years old at the time of the administrative hearing, February 12, 2009. (Tr. at 10, 42, 140, 145.) Claimant had a high school education and was able to communicate in English. (Tr. at 10, 171, 179.) In the past, she worked as a cashier, a fast food cook, a pencil sharpener assembler, and a retail manager. (Tr. at 10, 31, 173.)

The Medical Record

The Court has reviewed all the evidence of record, including the medical evidence, and will summarize it below as it relates to Claimant's claims regarding her mental impairments.

**Rainelle Medical Center**:

Claimant sought treatment from Dr. Singareddy and his associates at Rainelle Medical Center from August 10, 2007, through November 20, 2008. (Tr. at 312-22, 323-34, 344-55, 391-404, 405-33, 492-99, 519-21.) Claimant first was examined on August 10, 2007, by Dr. Mary Lou Fragile, D.O. (Tr. at 319-22.) At that time, Claimant was being prescribed Spiriva Handi-Haler 18 mcg, Aspirin 81 mg, Atenolol 50 mg, Celebrex 200 mg, and Premarin .625 mg. (Tr. at 319.)

Claimant reported a history of arthritis, hypothyroidism, hypertension, asthma, hyperlipidemia, fibromyalgia, rapid heart rate, dry eyes, and a depressive disorder. (Id.) On physical exam, Claimant weighed 176 pounds and stood 62 inches in height. (Tr. at 320.) Her blood pressure was 148/84 and her pulse was 92, which was indicated as regular. (Id.) Dr. Fragile noted that Claimant's mood and affect were normal. (Tr. at 321.) Dr. Fragile assessed hypothyroidism, hypertension, hyperlipidemia, a history of sinus tachycardia, depressive disorder NOS, anxiety, myalgia and myositis, symptomatic menopause, and arthritis. She reduced Claimant's Celebrex to 100 mg; gave her samples of Diovan for hypertension, Lipitor for hyperlipidemia, and Premarin for fibromyalgia. (Tr. at 322.)

On September 13, 2007, Dr. Fragile noted that Claimant was being examined for preventative maintenance. (Tr. at 312.) Claimant presented with back, joint, and muscle pain, as well as myalgia. (Tr. at 313.) Dr. Fragile observed that Claimant's gait and station were normal, that she was able to heel and toe walk without difficulty, and that her mood and affect were described as normal. (Tr. at 314.) Dr. Fragile prescribed Chantix to aid in smoking cessation and assessed hypertension and fibromyalgia. (Tr. at 314-15.)

Dr. Sanjay Singareddy, M.D., examined Claimant on November 1, 2007, for complaints of sinusitis. (Tr. at 352-55.) Dr. Singareddy noted that there were no present complaints of back or joint pain. (Tr. at 353.) On physical exam, Dr. Singareddy noted that Claimant was not in acute distress, that she had normal gait and station, and that her mood and affect were normal. (Tr. at 353-54.) Dr. Singareddy assessed acute sinusitis and prescribed medications. (Tr. at 354.) Dr. Fragile examined Claimant again on November 27, 2007, for complaints of depression, of acute onset. (Tr. at 348.) Claimant reported a persistent pattern of depression for eleven years, which had been increasing. (Id.) She reported feelings of sadness, nervousness, and tiredness, associated with the

8

death of a loved on. (Id.) She additionally reported difficulty sleeping, early morning awakening, episodes of spontaneous crying, excessive sweating, lack of energy, loss of libido, marital problems, palpitations, and use of sedatives. (Id.) Physical examination of Claimant essentially was normal. (Tr. at 349-50.) Dr. Fragile assessed depressive disorder NOS and prescribed Effexor XR 150mg and referred her to Seneca Health Services. (Tr. at 350.)

Dr. Fragile next examined Claimant on January 15, 2008, for complaints of neck pain, with a two week gradual onset. (Tr. at 401.) Claimant also reported pain behind both ears, a possible sinus infection, and headaches. (Tr. at 401-02.) Dr. Fragile noted that Claimant's mood and affect were depressed but that her physical exam, with the exception of some neck tenderness and lymphadenopathy, essentially was normal. (Tr. at 403.) She assessed fatigue, hypertension, and lymphadenopathy NOS, and ordered blood work. (Tr. at 403-04.)

On February 22, 2008, Pamela Butcher, D.O., conducted a follow-up examination of Claimant. (Tr. at 397-98.) Claimant reported that she felt well and had no complaints except for a decreased energy level and poor sleep, with only five hours of sleep per night. (Tr. at 397.) Dr. Butcher noted that Claimant was compliant with her treatment and experienced no side effects from her medication. (Id.) She assessed hypertension and noted that Claimant's condition had improved. (Tr. at 398.) On March 14, 2008, Claimant reported however, that she did not feel well and that her decreased energy level was worsening. (Tr. at 391.) Dr. Butcher noted that Claimant had myalgia and assessed hypertension and fatigue. (Tr. at 392-93.) Dr. Butcher's treatment notes indicate the Claimant's condition remained the same on March 8, 2008. (Tr. at 405-07.)

Claimant returned to Dr. Fragile on July 9, 2008, with complaints of back pain of gradual onset. (Tr. at 411.) Claimant reported that she had joined a weight loss program and had been

9

walking, but experienced back pain and her knees going out, with the right knee worse than the left. (Id.) A review of systems revealed fatigue, hearing loss and decreased hearing, hypertension and palpitations, joint pain, back pain, myalgia, syncope, and depression. (Tr. at 412.) On exam, Claimant was neither depressed nor anxious, and presented with normal gait and station. (Tr. at 413.) The physical exam essentially was normal. (Id.) Dr. Fragile assessed an unspecified vitamin D deficiency, hypertension, syncope and collapse, hearing loss, arthritis of the right knee, back pain, and hypothyroidism. (Tr. at 413-14.) She referred Claimant to Dr. Othman[3] for the syncope and to Dr. Christopher Lee White[4] for the hearing loss. (Tr. at 413.) Claimant's condition appeared to have

---

[3] Claimant was examined on September 5, 2008, by Dr. Joe O. Othman, M.D., a neurologist, on the July 14, 2008, referral from Dr. Fragile due to a syncopal episode that resulted in a motor vehicle accident. (Tr. at 470-73, 474-76, 477.) Claimant reported that she had a motor vehicle accident on April 3, 2008. (Tr. at 470.) The woman she hit stated that it appeared Claimant had blacked out, but Claimant had no memory of the event. (Id.) She thought that she may have fallen asleep because she had been tired prior to the accident. (Id.) Claimant reported that she had been having headaches that started suddenly and caused her to become nauseated and vomited. (Id.) Going to sleep relieved her headaches. (Id.) Physical examination essentially was normal. (Tr. at 471-72.) Dr. Othman concluded that Claimant suffered from excessive daytime sleepiness, but did not think that she suffered true syncope. (Tr. at 472.) Dr. Othman ordered an EEG, a sleep study, an MRI of the head, and instructed Claimant not to drive until her follow up appointment. (Tr. at 472, 474.)

The MRI of Claimant's head was normal. (Tr. at 467-68, 516.) At a follow up appointment on September 26, 2008, Claimant reported that she felt fine and was not having headaches. (Tr. at 467.) She also reported that she did not believe that she could do a sleep study, and mentioned that she took a pill to help her sleep. (Id.) Claimant also reported that she was under a lot of stress, had fibromyalgia, and had uncontrolled problems with her thyroid. (Id.) Dr. Othman noted nothing abnormal on examination, diagnosed headaches, and discharged Claimant. (Id.)

[4] Dr. Christopher White, D.O., examined Claimant on September 4, 2008, for complaints of bilateral hearing problems and a bursting in her right ear. (Tr. at 478-88.) Claimant reported that she had bilateral hearing loss for many years with occasional tinnitus and an occasional sensation of imbalance, which problems had worsened recently. (Tr. at 478.) Dr. White noted that Claimant had significant noise exposure as a factory worker without hearing protection devices. (Id.) Physical exam revealed an exophytic lesion on the left nostril, which Dr. White found suspicious in appearance. (Id.) An audiogram revealed likely mild sensory neural hearing loss. (Id.) Her pure tones however, did not correlate with her speech reception thresholds. (Id.) A nasal endoscopy failed

remained unchanged on May 5, 2008. (Tr. at 409-10.) An x-ray of Claimant's lumbar spine on July 9, 2008, revealed dextroscoliosis and x-rays of her right knee revealed no evidence of fracture or dislocation. (Tr. at 415.)

On September 9, 2008, Dr. Singareddy completed a form General Physical (Adults) on behalf of the West Virginia Department of Health and Human Resources. (Tr. at 488-89.) Dr. Singareddy noted that Claimant had, *inter alia*, decreased knee range of motion and crepitation. (Tr. at 488.) He indicated that Claimant experienced pain resulting from fibromyalgia, arthritis of the bilateral knees, and back problems. (Tr. at 489.) He reported her diagnoses as arthritis, hypothyroidism, and fibromyalgia. (Id.) Dr. Singareddy opined that Claimant was not able to work due to her chronic pain and that any physical activity should be avoided. (Id.) He did not consider her a candidate for vocational rehabilitation. (Id.)

Dr. Singareddy next examined Claimant on October 28, 2008, having last been examined by Dr. Fragile on July 9. (Tr. at 492-94.) Claimant reported that she did not feel well and had a decreased energy level, but was sleeping well and had a normal appetite. (Tr. at 492.) She stated that she exercised seven days per week and slept on average seven hours per night. (Id.) On examination, Dr. Singareddy noted that Claimant's mood was depressed, but failed to note any deficiencies on physical exam. (Tr. at 493.) He prescribed Diovan HCT 320-25mg for hypertension, Amitriptyline HCI 50mg for depressive disorder, Clonazepam 1mg for anxiety, Lyrica 100mg for fibromyalgia,

---

to reveal a nasopharyngeal mass and she had only slight postnasal drip. (*Id.*) Dr. White assessed an eustachian tube dysfunction and sensory neural hearing loss. (*Id.*) He prescribed Nasonex and directed Claimant to return in three weeks for a repeat audiotympanogram. (*Id.*) Dr. White noted that if the effusion persisted, he was going to consider tube placement. (*Id.*) On October 20, 2008, the results of her audiogram essentially were unchanged and she had a mild degree of hearing loss bilaterally. (Tr. at 490-91.)

and Sprivia HandiHaler 18mcg for chronic obstructive pulmonary disease/chronic airway obstruction. (Tr. at 493-94.) Dr. Singareddy discontinued her Cymbalta. (Tr. at 494.)

On November 20, 2008, Claimant again was examined by Dr. Singareddy. (Tr. at 519-20.) Claimant reported that she felt well with the exception of decreased energy and poor sleep. (Tr at 519.) Physical exam revealed joint pain, bilateral knee stiffness, and a depressed mood and affect. (Tr. at 520.) Dr. Singareddy assessed depressive disorder NOS. (Id.)

**Rainelle Physical Therapy**:

Claimant underwent physical therapy at Rainelle Physical Therapy from July 16, 2008, through February 2, 2009. (Tr. at 418, 428-33, 495, 497-99, 522-48.) She initially was discharged on October 6, 2008, with her therapist, Robert Schuetz, LPT, having noted that she declined follow-up due to money problems. (Tr. at 495.) Claimant re-initiated physical therapy and her last progress summary of record, dated, February 2, 2009, revealed that Claimant rated her back and knee paint at a level four out of ten, and reported that she was feeling better. (Tr. at 541.) On exam, Robert Schuetz, LPT, noted that Claimant was doing better with decreased pain and increased range of motion strength. (Id.) Claimant had 4/5 gross tone and was ambulatory with good posture. (Id.) Her therapy included five minutes on the stationary bike, ten minutes on the treadmill, wall weights at 17.5 pounds for 30 repetitions. (Id.) She also was doing 30 ball squats and crunches at 7.5 lbs for 30 repetitions. (Id.) Mr. Schuetz noted that Claimant was directed to continue physical therapy three times a week for an additional four to six weeks so that she could be functional with her daily activities with no pain, or with decreased pain. (Id.)

12

**Physical Residual Functional Capacity Assessments**:

On October 16, 2007, Dr. A. Rafael Gomez, M.D, a state agency reviewing physician, completed a form Physical Residual Functional Capacity Assessment. (Tr. at 335-42.) Dr. Gomez opined that Claimant's myalgias and arthralgias rendered her capable of performing medium exertional level work with frequent limitations in climbing ramps and stairs, balancing, stooping, kneeling, and crouching and occasional limitations in climbing ladders, ropes, and scaffolds; and crawling. (Tr. at 336-37.) Dr. Gomez further opined that Claimant should avoid concentrated exposure to vibration and workplace hazards such as moving machinery and heights. (Tr. at 339.) He noted that Claimant was not fully credible in that she had "multiple allegations which are not supported by the medical findings." (Tr. at 340.) He further noted that besides obesity, her physical exams were within normal limits, and that she was being treated for depression and anxiety. (Id.)

On May 2, 2008, Dr. Rabah Boukhemis, M.D., a state agency reviewing physician, completed a further form Physical Residual Functional Capacity Assessment. (Tr. at 441-48.) Dr. Boukhemis opined that Claimant's alleged fibromyalgia and severe depression, resulted in her ability to perform work at the medium exertional level. (Tr. at 441-42.) Regarding the fibromyalgia, Dr. Boukhemis noted that though Claimant had vague diffuse discomfort, there were no clear criteria available establishing fibromyalgia. (Tr. at 442.) Dr. Boukhemis assessed frequent postural limitations with the exception of occasional climbing ladders, ropes, and scaffolds, and crawling. (Tr. at 443.) Dr. Boukhemis also opined that Claimant should avoid concentrated exposure to temperature extremes, humidity, vibrations, environmental irritants, and workplace hazards. (Tr. at 445.) In reaching his opinions, Dr. Boukhemis acknowledged Claimant's allegations of increased memory loss, constant pain primarily in her joints, stomach pain, depression, and weight gain. (Tr.

13

at 446.) Nevertheless, Dr. Boukhemis opined that Claimant's allegations were out of proportion to the medical evidence and that most of her complaints were mental. (Id.)

**Dr. Samar Sankari, M.D.**:

Claimant was treated by Dr. Samar Sankari, M.D., from April 30, 2008, through October 30, 2008, for her hypothyroidism. (Tr. at 500-13.) On April 30, Dr. Sankari noted that Claimant was diagnosed with hypothyroidism one year ago by another physician and was prescribed Levothyroxine 50mg and at the time of her present exam, was taking Synthroid 50mg. (Tr. at 507, 509.) She noted Claimant's medical history to include fibromyalgia for 11 years, hypertension for six years, hyperlipidemia for four years, and a recent diagnosis of vitamin D deficiency. (Tr. at 507.) Dr. Sankari diagnosed possible Hashimoto's Disease and increased her Synthroid to 75mg. (Tr. at 508.) An ultrasound of Claimant's head and neck on May 8, 2008, revealed a mildly enlarged thyroid of irregular echogenicity and a small cyst in the mid pole region of the right thyroid. (Tr. at 506.) Claimant's condition remained essentially unchanged on July 30, 2008, and October 30, 2008. (Tr. at 500, 504.)

**Mental Impairments**:

**Psychological Evaluation - Judith Lucas, M.A.**:

On November 5, 2007, Judith M. Lucas, M.A., a licensed psychologist, conducted a psychological evaluation of Claimant. (Tr. at 356-58.) Claimant reported that she had moved to West Virginia in August, 2007. (Tr. at 356.) She indicated that she felt worthless and had been depressed for six years, with an increase in severity over the last year and a half. (Id.) Claimant stated that she would cry, did not want to do anything, became angry more easily but kept it in, and experienced excessive nervousness and worry. (Id.) Mental status exam revealed that Claimant's affect was

14

restricted and her mood depressed. (Tr. at 357.) She exhibited logical and organized thought processes, had normal judgment and fair insight, and normal immediate and remote memory. (Id.) Her recent memory was moderately deficient. (Id.) Ms. Lucas observed that Claimant exhibited no excessive movement or any evidence of delusions, preoccupations, or obsessions. (Id.) Ms. Lucas diagnosed major depressive disorder NOS and anxiety disorder NOS. (Tr. at 358.) She opined that Claimant's social functioning, concentration, persistence, and pace were within normal limits (Tr. at 357-58.) Ms. Lucas reported Claimant's daily activities to have included: visiting her brother, talking to her children, occasionally reading, sitting on the couch, doing dishes, placing clothes in the washer, occasionally cooking but noted that her husband usually cooked, seldom cleaned, watched the evening news, and showered and dressed herself with assistance from her husband. (Tr. at 357.)

**Mental Residual Functional Capacity Assessment**:

Dr. Timothy Saar, Ph.D., completed a form Mental Residual Functional Capacity Assessment (Tr. at 360-63.) and a form Psychiatric Review Technique (Tr. at 364-77.), on November 15, 2007. Dr. Saar opined that Claimant's major depressive and anxiety disorders moderately limited her ability to understand, remember, and carry out detailed instructions. (Tr. at 360-62.) He noted that the evidence did not support severe mental limitations and that Claimant was capable of performing of variety of repetitive work-like activities. (Tr. at 362.) He further opined that Claimant's mental impairments resulted in only mild limitations of activities of daily living and maintaining social functioning, concentration, persistence, or pace. (Tr. at 374.) He found no evidence of episodes of decompensation, each of extended duration. (Id.)

15

**Seneca Health Services, Inc.**:

Claimant sought treatment from Seneca Health Services, Inc., from November 20, 2007, through January 24, 2008. (Tr. at 378-85.) On December 20, 2007, Claimant voluntarily presented at Seneca and was examined by P. Michelle O'Dell, PA-C, for an initial psychiatric evaluation to render diagnosis and treatment recommendations. (Tr. at 384-85.) Claimant reported poor sleep and energy, and lack of motivation. (Tr. at 384.) Claimant had been prescribed Effexor two weeks earlier by her treating physician, and Claimant reported that the Effexor was beneficial. (Id.) Mental status exam revealed a broad affect and euthymic mood, connected and logical thought processes, no evidence of delusions or preoccupations, intact insight and judgment, and an appropriate behavior and demeanor. (Tr. at 385.) Ms. O'Dell diagnosed major depressive disorder, recurrent, mild and assessed a Global Assessment of Functioning ("GAF") of 60.[5] (Id.) She continued Claimant on Effexor at 150mg daily and the Ativan. (Id.) She prescribed Elavil 50mg for sleeplessness. (Id.) Claimant returned to Ms. O'Dell on January 24, 2008, for medication management. (Tr. at 382-83.) Claimant reported that the Elavil was ineffective in addressing sleeplessness, and she continued to report fatigue, lack of energy, and a lack of motivation and sadness. (Tr. at 382.) Mental status examination remained unchanged, as did Ms. O'Dell's diagnosis. (Id.) Ms. O'Dell discontinued the Elavil and prescribed Klonopin 1mg. (Id.) She instructed Claimant to use Ativan on an as needed basis, and decreased Effexor XR to 75mg daily for a week and then to begin Cymbalta 30mg daily

---

[5] The Global Assessment of Functioning ("GAF") Scale is used to rate overall psychological functioning on a scale of 0 to 100. A GAF of 51-60 indicates that the person has moderate symptoms, or moderate difficulty in social, occupational, or school functioning. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32 (4th ed. 1994).

for one week, which was then increased to 60mg. (Id.) Ms. O'Dell also prescribed Lyrica 75mg. (Tr. at 383.)

On February 22, 2008, Claimant reported to Julie Hanna, PA-C, that she stayed extremely tired all the time and that she was so fatigued that she could hardly do anything. (Tr. at 380.) Claimant also reported that her Synthroid 50mcg was not working and that she continued to experience dry and brittle hair that fell out, as well as dry skin, depression, fatigue, and memory loss. (Id.) On mental status examination, Claimant's affect was constricted and her mood was euthymic. (Id.) All other facets remained unchanged. (Id.) Ms. Hanna diagnosed major depressive disorder, recurrent, mild; and anxiety disorder. (Id.) Claimant was continued on her medications. (Tr. at 381.) On March 11, 2008, Claimant reported some mild depression and symptoms associated with the hypothyroidism. (Tr. at 378.) Claimant's affect was restricted and her mood was mildly dysthymic. (Id.) Diagnoses and treatment remained unchanged. (Tr. at 378-79.)

**Mental Status Examination - Tina Fontenot, M.S.**:

Tina Fontenot, M.S, a licensed psychologist, completed a mental status examination on Claimant on April 15, 2008. (Tr. at 434-38.) Claimant stated that she left her husband last Friday. (Tr. at 434.) Ms. Fontenot described Claimant as cooperative with a serious attitude. (Id.) Claimant reported that she had been depressed for two years due to the pain that she suffered. (Tr. at 435.) Claimant reported sleep disturbances in the form of initial insomnia, intermittent awakenings, and terminal insomnia. (Id.) She also reported poor appetite, daily low energy and fatigue, and feelings of hopelessness and helplessness. (Id.) Mental status exam revealed a depressed mood and tearful affect, normal stream of thought, and no evidence of delusions or obsessive compulsive behaviors. (Tr. at 436.) Her insight was fair, her judgment was within normal limits, as was her immediate

17

memory. (Id.) Claimant's recent memory was severely deficient and her remote history was moderately deficient. (Id.) Claimant's concentration was moderately deficient, but her pace and persistence were within normal limits. (Id.) Claimant made good eye contact but cried on and off throughout the evaluation. (Tr. at 437.)

Claimant reported her activities to have included visiting her brother daily and taking care of his laundry, shopping for groceries with her husband, sitting on the couch, and watching very little television. (Tr. at 437.) Claimant stated that her husband did the dishes, cooked, and paid the bills. (Id.) Ms. Fontenot diagnosed dysthymic disorder, anxiety disorder NOS, and panic disorder without agoraphobia. (Id.) Ms. Fontenot gave Claimant a poor prognosis but found that she was capable of managing her finances. (Id.)

**Evidence Submitted to the Appeals Council**:

Claimant's counsel submitted treatment records from Seneca, dated December 20, 2007, through June 5, 2009. (Tr. at 554-73.) On December 20, 2007, Ms. O'Dell examined Claimant on her reports of poor sleep and energy, lack of motivation, and anxiety. (Tr. at 556.) Mental status exam revealed a broad affect and euthymic mood, intact insight and judgment, and satisfactory attention. (Tr. at 557.) Ms. O'Dell diagnosed major depressive disorder, recurrent, mild and assessed a GAF of 60. (Id.) Claimant was continued on Effexor 150mg and Ativan as needed. (Id.) For sleeplessness, Ms. O'Dell prescribed Elavil 50mg. (Id.)

On March 11, 2008, Claimant reported that she was very tired and had many symptoms of hypothyroidism. (Tr. at 562.) Claimant's affect was restricted and her mood was mildly dysthymic. (Id.) Ms. Hanna continued Claimant's diagnoses and medications. (Id.) Claimant returned to Ms. Hanna on June 5, 2008, and reported that she was separated from her husband, sleeping only

four hours at night, that her fibromyalgia pain had increased, and that she was under significant stress. (Tr. at 564.) Claimant's affect was broad and her mood euthymic. (Tr. at 565.) Ms. Hanna continued her diagnoses and assessed a GAF of 65.[6] (Id.) Claimant was continued on Cymbalta 60mg, her Lyrica was increased to 150mg twice daily for fibromyalgia, and her Klonopin was increased to 2mg at bedtime to help with her sleep. (Id.)

More than a year later, Claimant reinitiated her treatment at Seneca on June 1, 2009. (Tr. at 566-68.) Dr. Jewell observed on mental status exam that Claimant's affect generally was dysthymic, with a congruent mood. (Tr. at 567.) Claimant stated that she felt depressed. (Id.) Her thought process and content was normal, with no evidence of delusions, preoccupations, or hallucinations. (Id.) Dr. Jewell noted that she was alert and oriented and had intact insight and judgment. (Id.) He diagnosed major depressive disorder, recurrent and generalized anxiety disorder. (Id.) Dr. Jewell also assessed a GAF of 54. (Id.) Dr. Jewell began titrating Claimant off the Effexor XR by giving her Pristiq 50mg twice daily. (Id.) He continued the Clonazepam 1mg and told her to return in one week. (Id.)

On June 4, 2009, Claimant's mood was anxious and depressed. (Tr. at 569.) Mike McDaniel, M.A., a licensed psychologist, administered the Beck Depression Inventory - II, which suggested a severe level of depressive features, as well as the Beck Anxiety Inventory, which suggested a severe level of anxiety symptomatology. (Id.) On mental status exam, Claimant had adequate judgment and insight, a fair appetite, intact memory, and an anxious and depressed mood. (Id.)

---

[6] A GAF of 61-70 indicates that the person has some mild symptoms or "some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32 (4th ed. 1994)

Mr. McDaniel diagnosed depressive disorder, recurrent, moderate; anxiety disorder NOS; and assessed a GAF of 50.[7] (Tr. at 570.) On June 5, 2009, Claimant presented with a full affect and euthymic mood. (Tr. at 571.) Dr. Noel Jewell, M.D., diagnosed major depressive disorder and anxiety disorder NOS, and started Claimant on Diazepam 5mg as needed for anxiety and Celexa 20mg a day. (Id.)

**EMG and Nerve Conduction Study - Dr. Othman**:

On May 21, 2009, Dr. Othman conducted an EMG and Nerve Conduction Study of Claimant's bilateral upper extremities, which revealed mild bilateral carpal tunnel syndrome with the right greater than the left. (Tr. at 576-77.)

**Dr. Pradip C. Thakkar, M.D.**:

Claimant treated with Dr. Pradip C. Thakkar, M.D., from September 14, 2001, through February 20, 2009. (Tr. at 577-81.) Claimant first presented to Dr. Thakkar on September 14, 2001, with a two year history of chronic joint pain, tiredness, and lethargy. (Tr. at 577.) He noted that she has been diagnosed with possible Lupus, osteo-arthritis, or degenerative osteo-arthritis. (Id.) Claimant complained of generalized weakness and fatigue, some morning stiffness that improves throughout the day, a fair appetite, and some pain in both legs. (Id.) On physical exam, Dr. Thakkar noted tender point of the fibromyalgia at the "suprascapular, costs chondral, elbow, and popliteal area." (Id.) He did not observe any obvious osteo-arthritis in the peripheral joints. (Id.) He assessed fibromyalgia and prescribed Celebrex 200mg and Elavil 10mg, as well as hypertension. (Tr. at 578.)

---

[7] A GAF of 41-50 indicates that the person has some serious symptoms "(e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting)" or "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32 (4th ed. 1994)

On September 27, 2001, Dr. Thakkar noted that Claimant's lupus blood test was normal. (Tr. at 580.) Claimant reported that she felt better with the Celebrex and indicated that she had more energy than before. (Id.) Dr. Thakkar continued Claimant's medications and instructed her to return in four months. (Id.) Claimant returned for a follow-up visit on February 20, 2002. (Tr. at 581.) Claimant reported no improvement in her chronic lower leg pain and reported that she has cold feet. (Id.) Dr. Thakkar noted that she had slight hyperemia of peripheral vascular disease, but observed no selling of her extremities. (Id.) He assessed peripheral vascular disease, acute sinusitis, and hypertension. (Id.)

**Piedmont Health Care**:

Claimant treated with Dr. Duncan A. McCall, M.D., a rheumatologist at Piedmont HealthCare, from March 13, 2000, through June 15, 2001. (Tr. at 582-98.) On March 13, 2000, Claimant reported intermittent pain in the ribs and pain and swelling in the hands, elbows, knees, and feet. (Tr. at 582.) The pain was worse in the mornings and gradually improved into the evening. (Id.) Diagnostic tests were all normal and the non-steroidal anti-inflammatory medications were of no benefit. (Id.) Claimant also reported an erythematous and pruritic rash as well as red and painful eyes. (Id.) Dr. McCall diagnosed "probable inflammatory arthropathy, rule out dermatomyositis versus lupus versus rheumatoid arthritis or a seronegative spondyloarthropathy. (Tr. at 583.) He ordered laboratory testing and prescribed Prednisone 5mg for one week, which was to be decreased to one 5mg tablet a day. (Id.)

On April 18, 2000, Dr. McCall noted that all of Claimant's inflammatory markers were negative, though he believed she had possible inflammatory arthropathy. (Tr. at 586.) He noted however, that Claimant's history indicated that her arthropathy was episodic in nature. (Id.)

21

Therefore, Dr. McCall placed her on a trial of Medrol 4mg, as well as Flexeril because she presented with multiple tender trigger points. (Id.) On June 6, 2000, Dr. McCall noted that Claimant had probable connective tissue disease. (Id.) She presented with a rash on her face associated with significant muscle and joint pain. (Id.) He prescribed Plaquenil. (Id.)

Claimant returned to Dr. McCall on July 18, 2000, with a flare up of her "episodic inflammatory arthropathy." (Tr. at 588.) Claimant next returned to Dr. McCall on March 19, 2001, with another episode of arthropathy. (Id.) She reported that she stopped taking Plaquenil in December because it was of no benefit to her. (Id.) She also reported continued flare ups with mostly myalgias and fatigue. (Id.) Claimant was taking Mobic without any benefit. (Id.) Dr. McCall therefore, prescribed Colchicine. (Id.) He noted that Claimant's "inflammatory markers at her last visit were again normal. It may be of some benefit to treat this more as a fibromyalgia variant." (Id.)

**Greenbrier Valley Medical Center**:

On May 10, 2009, Claimant presented at Greenbrier Valley Medical Center with complaints of arthritis and fibromyalgia pain. (Tr. at 610.) She reported that the pain was located across her thorax, bilateral upper extremities, neck, back, and ankles, and she rated the pain at a level eight out of ten. (Tr. at 607, 610.) Claimant was taking Lyrica, Elavil, and Diclofenac for her pain, which had not been helping. (Tr. 610) Physical exam revealed that Claimant was alert, interactive, and in no acute distress. (Id.) She was tender to palpation across the interior and posterior portions of her thorax, hips, and knees, but was ambulatory without difficulty. (Tr. at 607, 610.) Dr. Patrick Thomas Ryan, M.D., assessed exacerbation of Claimant's fibromyalgia and osteoarthritis, and administered a dose of Toradol 60mg. (Tr. at 610-11.) After 15 minutes, Dr. Ryan noticed a mild improvement in her pain, and discharged her with instructions to follow up with Dr. Singareddy in three to five

22

days. (Tr. at 611.)

**Mental Residual Functional Capacity Assessment - Dr. Noel Jewell, M.D.**:

On June 24, 2009, Dr. Noel B. Jewell, M.D., completed a form Mental Residual Functional Capacity Questionnaire. (Tr. at 613-20.) Dr. Jewell noted Claimant's diagnoses as mild major depressive disorder with a GAF of 58. (Tr. at 615.) Supporting clinical findings included a depressed interest, feelings of guilt or worthlessness, generalized persistent anxiety, difficulty thinking or concentrating, psychomotor agitation or retardation, memory impairment, sleep disturbance, and decreased caring. (Tr. at 615-16.) He further noted that Claimant was treated with Celexa 20mg and Diazipan 5mg, and that her response to treatment was "good." (Tr. at 615.) Dr. Jewell opined that Claimant's prognosis was chronic and fair. (Id.) Dr. Jewell opined that Claimant's abilities and aptitudes needed to do unskilled, semiskilled, and skilled work were seriously limited but not precluded. (Tr. at 617-18.) He further opined that Claimant's ability to use public transportation was seriously limited but not precluded, but that her ability to interact appropriately with the general public, maintain socially appropriate behavior, adhere to basic standards of neatness and cleanliness, and travel in unfamiliar places was limited but satisfactory. (Tr. at 618.) Dr. Jewell believed that Claimant's psychiatric condition exacerbated her fibromyalgia and emotionally-linked pain. (Id.) He also opined that on average, Claimant's impairments and treatment would cause her to miss about one day per month of work and that her conditions were expected to last at least twelve months. (Tr. at 619.)

Claimant's Challenges to the Commissioner's Decision

Claimant alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in failing to accord proper weight to the opinions of her treating physician,

Dr. Singareddy. (Document No. 14 at 10-13.) Specifically, Claimant takes issue with the ALJ having rejected Dr. Singareddy's opinions because "they were submitted to influence the disability fact-finding process," and asserts that such reasoning "defies both law and logic." (Id. at 12.) Claimant asserts that "[i]t makes absolutely no sense, and under the regulations it is patently not a cognizable basis upon which to predicate the rejection of a treating physician's opinion." (Id.)

In response, the Commissioner asserts that the ALJ properly did not give controlling weight to Dr. Singareddy's opinions because they were outside his area of expertise, were not well explained, and failed to find support in his own treatment records. (Document No. 17 at 7-8.) The Commissioner points out that Claimant was examined by Dr. Singareddy only a few times and his treatment notes were void of any musculoskeletal examinations. (Id. at 8.) The Commissioner further asserts that Dr. Singareddy's opinions are refuted by Claimant's progress in physical therapy and his own routine follow-up treatment notes. (Id.) Finally, the Commissioner notes that Dr. Singareddy himself, reported in February, 2009, that Claimant reported only minor complaints and that she considered her medications to have been effective. (Id.) Consequently, the Commissioner asserts that the AlJ's decision not to accord significant weight to the opinions of Dr. Singareddy is supported by substantial evidence. (Id. at 8, 10.)

Claimant also alleges that the ALJ's RFC determination is not supported by substantial evidence because he failed to consider properly the opinions of Dr. Singareddy. (Document No. 14 at 13-21.)

Analysis.

1. Treating Physician Opinion.

"RFC represents the most that an individual can do despite his or her limitations or

24

restrictions." See Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996). Pursuant to SSR 96-8p, the RFC assessment "must be based on all of the relevant evidence in the case record," including " the effects of treatment" and the "limitations or restrictions imposed by the mechanics of treatment; e.g., frequency of treatment, duration, disruption to routine, side effects of medication." Looking at all the relevant evidence, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. §§ 404.1545(a), 416.945(a) (2009). "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)." Id. "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996).

Opinions on a claimant's Residual Functional Capacity are issues that are reserved to the Commissioner. The Regulations state that:

> We use medical sources, including your treating source, to provide evidence, including opinions, on the nature and severity of your impairment(s). Although we consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments in appendix 1 to subpart P of part 404 of this chapter, your residual functional capacity . . . or the application of vocational factors, the final responsibility for deciding these issues is reserved to the Commissioner.

See 20 C.F.R. § 416.927(e)(2) (2009).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physicians' opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

The Regulations state that opinions on these issues are not medical opinions as described in the Regulation dealing with opinion evidence (20 C.F.R. §§ 404.1527(a)(2) and 416.927(a)(2)); rather, they are opinions on issues reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e) and 416.927(e). For that reason, the Regulations make clear that "[w]e will not give any special significance to the source of an opinion on issues reserved to the Commissioner. . . ." Id. §§ 404.1527(e)(3) and 416.927(e)(3). The Regulations further provide that "[f]or cases at the Administrative Law Judge hearing or Appeals Council level, the responsibility for deciding your residual functional capacity rests with the Administrative Law Judge or Appeals Council." See 20 C.F.R. §§ 404.1545 and 416.946 (2009). However, the adjudicator must still apply the applicable factors in 20 C.F.R. § 416.927(d) when evaluating the opinions of medical sources on issues reserved to the Commissioner. See Social Securing Ruling ("SSR") 96-5p, 61 FR 34471, 34473 (1996).

Social Security Ruling 96-5p makes a distinction between an RFC assessment, which is "the adjudicator's ultimate finding of 'what you can still do despite your limitations,'" and a "'medical source statement,' which is a 'statement about what you can still do despite your impairment(s)' made by an individual's medical source and based on that source's own medical findings." Id. SSR 96-5p states that "[a] medical source statement is evidence that is submitted to SSA by an individual's medical source reflecting the source's opinion based on his or her own knowledge, while an RFC assessment is the adjudicator's ultimate finding based on a consideration of this opinion and all the other evidence in the case record about what an individual can do despite his or her impairment(s)." Adjudicators "must weigh medical source statements under the rules set out in

26

20 C.F.R. § 416.927, providing appropriate explanations for accepting or rejecting such opinions." Id. at 34474.

Every medical opinion received by the ALJ must be considered in accordance with the factors set forth in 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2009). These factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors. Additionally, the Regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. §§ 404.1527(d)(2) and 416.927(d)(2).

Under §§ 404.1527(d)(1) and 416.927(d)(1), more weight is given to an examiner than to a non-examiner. Sections 404.1527(d)(2) and 416.927(d)(2) provide that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources). Sections 404.1527(d)(2)(I) and 416.927(d)(2)(I) state that the longer a treating source treats a claimant, the more weight the source's opinion will be given. Under §§ 404.1527(d)(2)(ii) and 416.927(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's opinion. Sections 404.1527(d)(3), (4) and (5) and 416.927(d)(3), (4), and (5) add the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty). Unless the ALJ gives controlling weight to a treating source's opinion, the ALJ must explain in the decision the weight given to the opinions of state agency psychological consultants.

27

20 C.F.R. §§ 404.1527(f)(2)(ii) and 416.927(f)(2)(ii) (2009). The ALJ, however, is not bound by any findings made by state agency medical or psychological consultants and the ultimate determination of disability is reserved to the ALJ. Id. §§ 404.1527(f)(2)(I) and 416.927(f)(2)(I).

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2009). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2009). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2009). Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the Court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527 and 416.927(d)(2)-(6).

In his decision, and as summarized above, the ALJ noted that Dr. Singareddy examined Claimant on only three occasions, November 2007, October 2008, and November 2008. ( Tr. at 16-

28

17, 23, 25.) With the exception of some depression, and complaints of decreased energy, knee pain, and stiffness, Dr. Singareddy's review of symptoms was negative for musculoskeletal, neurological, or psychiatric symptoms. (Id.) The ALJ noted that Dr. Singareddy rendered his first opinion in September 2008, after having last examined Claimant approximately ten months prior. (Tr. at 23.) The ALJ found that Dr. Singareddy's opinion was not supported by the treatment notes before and after his opinion. (Id.) To that extent the ALJ stated that Dr. Singareddy "adopted an advocacy role early on with little longitudinal perspective of the [C]laimant's medical and functional condition and status when he completed the form." (Id.) The ALJ further concluded that the form was based on Claimant's "self-assessment and subjective complaints." (Id.) The undersigned notes that the additional treatments from Dr. Singareddy's associates at Rainelle Medical Center, as summarized above, likewise did not support Dr. Singareddy's opinion.

The ALJ further noted that Dr. Singareddy rendered his second opinion in February, 2009, two weeks after Claimant's administrative hearing. (Tr. at 24-25.) The ALJ determined however, that his opinion, which essentially rendered Claimant capable of performing less than sedentary activities, was contrary to physical therapy notes that indicated Claimant was lifting more than five pounds and was doing some squatting and crouching. (Id.) The ALJ therefore concluded that neither Dr. Singareddy's treatment notes, nor the medical record as a whole reflected a debilitating musculoskeletal disorder, and to the extent that Claimant had a musculoskeletal disorder, it was episodic in nature, as demonstrated in the ALJ's chart. (Tr. at 24-26.) Regarding Dr. Singareddy's opinions as to Claimant's mental capabilities, the ALJ determined that as a general practitioner, psychiatric impairments were beyond Dr. Singareddy's expertise. (Tr. at 25.) Furthermore, the ALJ

29

noted that contrary to Dr. Singareddy's opinion, the record did not reflect any incapability on Claimant's part to maintain her personal appearance. (Id.)

In view of the foregoing, the Court finds that the ALJ properly considered Dr. Singareddy's opinions according to the factors set forth in the Regulations, but found that his opinions were not entitled to significant weight. As discussed above, Dr. Singareddy's stringent opinions were inconsistent with his treatment notes, the treatment notes of the other physicians at his place of practice, and were inconsistent with the opinions of the state agency reviewing physicians, as summarized above. The record is void of any radiological evidence that supported Dr. Singareddy's opinions. Though the ALJ stated early in his decision that Dr. Singareddy's opinion that was submitted after the administrative hearing was submitted "to influence the disability fact-finding process," the ALJ specifically qualified such statement to the delay in its receipt. (Tr. at 9.) Regarding Claimant's mental impairments, the ALJ properly determined that opinions on such issues were beyond Dr. Singareddy's expertise and that Claimant's depression with occasional anxiety was sporadic in complaints and limited in treatment. (Tr. at 27.) Dr. Singareddy's treatment notes likewise did not suggest severe debilitating mental impairments and his opinion as to the same was contrary to the GAF scores that indicated only mild to moderate symptoms.

Accordingly, in view of the foregoing, the Court finds that the ALJ properly considered pursuant to the Regulations, that the opinions of Dr. Singareddy were not entitled to significant weight.

2. Residual Functional Capacity Assessment.

Claimant asserts that because the ALJ failed to consider properly Dr. Singareddy's opinions, his RFC assessment therefore, is flawed. (Document No. 14 at 13-21.) The Court has determined

that the ALJ's decision not to accord significant weight to Dr. Singareddy's opinions was supported by substantial evidence. Nevertheless, the Court has reviewed the ALJ's RFC assessment and has determined that it, too, is supported by substantial evidence.

As the Commissioner points out, Claimant's lack of credibility was crucial to the ALJ's RFC assessment. Regarding Claimant's physical impairments, the ALJ summarized the medical notes that established episodic musculoskeletal complaints. (Tr. at 24-27, 30-31.) Despite such episodic complaints, Claimant continued to exercise seven days a week and was able to function at the light to moderate level as part of her physical therapy. The records submitted to the Appeals Council did not add to or detract from the ALJ's decision. The medical record failed to support Claimant's severe complaints and reports of limitation and at times, Claimant's reports were inconsistent. To the extent that Claimant had limitations, the ALJ incorporated postural limitations in his RFC assessment, as well as limitations regarding her respiratory problems. (Tr. at 30.)

Regarding Claimant's mental impairments, the ALJ summarized the medical evidence which established that her mental-related complaints were sporadic in nature as well, and focused on stressful periods in her life such as her divorce. (Tr. at 27-28, 30-31.) Her mental examinations essentially were normal with some mild to moderate limitations, as summarized above. Consequently, contrary to Claimant's allegations, the ALJ properly found that the longitudinal record did not demonstrate severe mental impairments of a twelve month duration. (Tr. at 28.) To the extent that Claimant had any limitations resulting from her mental impairments, the ALJ precluded Claimant from workplace hazards and limited her balancing, too. (Tr. at 30.) The ALJ concluded that Claimant attempted to minimize her level of activities and exaggerated her symptoms and limitations. (Tr. at 31.)

Accordingly, the Court found that the ALJ's decision to not accord significant weight to the opinions of Dr. Singareddy was supported by substantial evidence. Consequently, Claimant's second argument that the ALJ's RFC assessment was flawed due to his failure to accord the appropriate weight to Dr. Singareddy's opinions, is without merit. Nevertheless, the Court reviewed the ALJ's RFC assessment and found that it was made pursuant to the Regulations and caselaw, and therefore, is supported by substantial evidence.

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision is supported by substantial evidence. Accordingly, by Judgment Order entered this day, the Plaintiff's Motion for Summary Judgment (Document No. 13.) is **DENIED**, Defendant's Motion for Judgment on the Pleadings (Document No. 17.) is **GRANTED**, the final decision of the Commissioner is **AFFIRMED**, and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to provide copies of this Memorandum Opinion to counsel of record.

ENTER: July 8, 2011.

R. Clarke VanDervort
United States Magistrate Judge